## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

PHYLLIS PEDOTO SMITH,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-351

Dlott, J.

Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 9), the Commissioner's response in

opposition (Doc. 12), and plaintiff's reply memorandum. (Doc. 15).

### I. Procedural Background

Plaintiff filed applications for DIB and SSI in October 2007, alleging disability since

August 25, 2005, due to a shattered right leg, bipolar disorder, depression, anxiety, high blood

pressure and diabetes. Plaintiff's applications were denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a de novo hearing before administrative

law judge (ALJ) Christopher B. McNeil. Plaintiff, along with a medical expert (ME) and a

vocational expert (VE), appeared and testified at the ALJ hearing. On February 22, 2010, the

ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review

by the Appeals Council was denied, making the decision of the ALJ the final administrative

decision of the Commissioner.

## II. Medical Evidence

### A. Physical Impairments

Plaintiff was involved in a motor vehicle accident in February 2006. (Tr. 257-79). She sustained rib fractures and a broken right femur. Plaintiff underwent surgery for a right distal femur fracture, and screws and a metal rod were surgically placed in her leg. (Tr. 269-70). X-rays of plaintiff's lumbar and thoracic spine and right hip showed no acute abnormality. (Tr. 263-64, 305). A CT scan of plaintiff's cervical spine showed mild degenerative changes and mild disc bulges. (Tr. 257-58).

Plaintiff was doing well overall when seen at the Orthopaedic Outpatient Center at University Hospital for surgical follow-up on March 13, 2006, although she continued to be nonweight-bearing. (Tr. 281). One month later, plaintiff presented to the University Hospital emergency room for evaluation of right leg pain. She had not been wearing her splint as directed, and her leg had started swelling. (Tr. 285). Examination revealed tenderness over the mid-femur and mild swelling and mild posterior popliteal tenderness. Plaintiff was given Percocet and instructed to wear her splint. (Tr. 285-86).

Plaintiff was evaluated for physical therapy for her right leg injury in June 2006. (Tr. 318-20). Plaintiff related her pain intensity to be "8" on a 1 to 10 pain scale. (Tr. 319). Examination revealed right knee swelling and an inability to fully extend the knee while standing. (Tr. 320). Plaintiff did not return for treatment after the initial evaluation and consequently was discharged from physical therapy in September 2006. (Tr. 316-17).

Plaintiff was examined by state agency physician C. Herbert Schapera, M.D., in September 2008. Dr. Schapera noted during his examination that right knee flexion was only

2

25% of normal and extension was diminished to 5 to 10 degrees, but there was no swelling or redness. Plaintiff also had slightly reduced range of motion in her right hip, especially rotation. Plaintiff ambulated with a limping gait but without the use of an ambulatory aid. Plaintiff was comfortable both sitting and standing. She reported she was taking Percocet. Plaintiff's neurological examination was completely normal. Examination of the upper extremities was also normal. Dr. Schapera concluded based on his examination findings that plaintiff appeared capable of performing at least a mild amount of sitting, ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects, but she could not kneel. He also found that plaintiff would have no difficulty reaching, grasping, and handling objects. (Tr. 502-09).

Plaintiff was seen by Errol Stern, M.D., at Tristate Orthopaedic Treatment Center on August 13, 2008. She complained of pain in her knee joint. Dr. Stern noted she walked with a limp. The knee fracture was healed and the rod was causing pain on the outer lateral aspect of her femur directly where the screws were. Because of her chronic knee pain, Dr. Stern recommended that she have the rod in her right femur extracted. (Tr. 579). Clyde Henderson, M.D., of Tristate Orthopaedics ordered an EMG of plaintiff's right leg, which was normal. (Tr. 604). A bone scan showed multifocal arthropathy but no fracture or osteomyselitis. (Tr. 603).

After reviewing the record on October 13, 2008, state agency physician Nick Albert, M.D., opined that plaintiff could lift, carry, and push/pull 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. Dr. Albert also opined that plaintiff could never kneel or climb ladders/ropes/scaffolds; she could occasionally crawl and climb ramps/stairs; and she could frequently balance, stoop, and crouch. (Tr. 512-19).

3

On October 31, 2008, plaintiff had surgery to remove the distal fixation screws from her right femur. A chondroplasty of the patella, trochlea of the femur, and medial femoral condyle was performed at the same time. (Tr. 580-81).

Plaintiff was initially seen by Jose Martinez, M.D., on December 16, 2008. (Tr. 521). Plaintiff saw Dr. Martinez three more times on January 15, January 30, and February 3, 2009 before Dr. Martinez wrote a letter and completed an assessment of plaintiff's work-related functional abilities. (Tr. 555-562). In the letter dated February 19, 2009, Dr. Martinez wrote that plaintiff had presented with a history of chronic low back pain and right knee pain syndrome. He reported that an MRI of the lumbar spine and an x-ray of the cervical spine taken in January 2009 showed mild to moderate cervical osteoarthritis, mild disc bulge, and mild degenerative disc disease in the lumbar spine, but no evidence of focal disc herniation or stenosis. (Tr. 527-30). Dr. Martinez stated that based on the clinical findings, plaintiff suffered severe impairments resulting from the following conditions: severe cervical facet arthritis, lumbar radiculitis, lumbar facet arthropathy, status open reduction internal fixation of the right femur 2006, status post-fracture of the right hip and status post-total right hip replacement in 2008[1], anxiety and depression as a result of her severe pain, and chondromalacia patella of the right knee with extreme walking disability. (Tr. 521-22). Dr. Martinez opined that plaintiff's conditions prevented her "from working in any job category." (Tr. 522). He stated that plaintiff's conditions interfered with her activities of daily living such as walking, sitting, lifting and grooming, and that she ambulated only with extreme difficulty with the use of a cane. He expected that plaintiff's conditions and impairments would last beyond 12 months. Dr. Martinez

---

[1]There is no medical or other evidence of record pertaining to a hip fracture or replacement.

4

opined that plaintiff's conditions would continue to worsen over time and could require further treatment such as a physical rehabilitation program and pain management. (*Id.*).

Dr. Martinez also completed a Work Ability Questionnaire wherein he opined that plaintiff could occasionally lift, carry, and push/pull less than 10 pounds; she could stand/walk less than two hours in an eight-hour workday and she required a cane for walking; and she could sit less than six hours in an eight-hour workday. (Tr. 523-524). According to Dr. Martinez, pushing/pulling in the lower extremities was limited; she could occasionally climb; she could never balance, kneel, crouch, or crawl; reaching is limited in all directions; and she could not work in environments with extreme temperatures, noise, dust, vibrations, humidity, hazards, fumes, odors, chemicals or gases. (Tr. 523-26).

Dr. Martinez ordered an MRI of the lumbar spine in May 2009. The MRI showed 1) a bulging disc with narrowing at L3-4, and 2) facet arthropathy at L3-4 on the left. (Tr. 532-33).

In June 2009, Michael Bertram, M.D., a partner of Dr. Martinez, saw plaintiff following surgical partial removal of hardware from her right knee. Plaintiff complained of continuing pain around the right knee and right buttock area. Dr. Bertram reported that plaintiff could "easily stand and ambulate, but walks favoring her right lower extremity." (Tr. 565). He reported that plaintiff had difficulty walking on her heels because of the pain, and she tended not to flex the right knee. She had normal range of motion in her spine with some localized tenderness in the sacroiliac joint. Dr. Bertram refilled plaintiff's Percocet prescription and recommended a possible sacroiliac joint injection. (Tr. 565-66).

Plaintiff was seen by Dr. Stern at the Tristate Orthopaedic Treatment Center in October 2009 for chondromalacia and a painful prosthetic component. Dr. Stern noted that she still had a rod in her right knee that Dr. Henderson had been unable to surgically extract that was causing

some discomfort. Plaintiff complained of knee, hip and femur pain. On examination, plaintiff had crepitation, swelling, and a knee flexion contracture that Dr. Stern noted needed to be worked out by therapy. Dr. Stern reported plaintiff has arthritis of the knee joint, and he believed she would be an excellent candidate for Orthovisc[2]. Dr. Stern injected plaintiff's knee with Celestone and Marcaine and stated he would re-evaluate plaintiff for ongoing care once approval for the Orthovisc was obtained. (Tr. 570).

In November 2009, when seen for follow-up of partial removal of the hardware from her right knee, plaintiff still had some pain in the lateral knee. It was noted that scars were well-healed, x-rays were normal, and there was no significant effusion. Plaintiff was given range of motion and strengthening exercises to do and was prescribed pain medication. (Tr. 571-72).

Plaintiff was initially seen at The Pain Center at University Pointe on November 2, 2009, for consultation and evaluation of right leg and hip pain. (Tr. 629-35). Plaintiff described her pain as constant, sharp and throbbing with occasional shooting pain from her right knee to the hip. She rated the pain as 8/10 on the analog pain scale. Plaintiff reported her pain was aggravated by lifting, going up and down stairs, and walking for more than five minutes. Plaintiff had full range of motion in her back and some paraspinal tenderness, a steady gait, and intact sensation. (Tr. 631-33). A trochanteric bursa injection and a trial TENS unit were recommended, and Zanaflex was prescribed. (Tr. 635).

When plaintiff's family physician, Dr. Ashok Kejriwal, examined plaintiff in November 2009, he noted her musculoskeletal exam showed no joint pain, stiffness, or swelling, no back pain, and no gait abnormalities. (Tr. 620-21).

---

[2]Orthovisc (hyaluronan) is a substance that is injected into the knee joints for the treatment of pain in individuals with osteoarthritis. *See* www.drugs.com

Chukwuemeka Ezike, M.D., M.P.H., a physician board certified in internal and occupational medicine (Tr. 94), testified via telephone at the administrative hearing as the ME.[3] (Tr. 29-39). After summarizing plaintiff's medical history of her physical impairments, Dr. Ezike testified that those impairments did not meet or medically equal any listed impairment. (Tr. 31-33). Based on plaintiff's reported symptoms, Dr. Ezike opined that plaintiff would be able to lift and push/pull about 20 pounds occasionally and 10 pounds frequently; stand and/or walk about two hours a day, with breaks; and sit less than six hours a day, with breaks. (Tr. 33). Dr. Ezike further opined that plaintiff should not climb ropes, ladders, or scaffolds but could occasionally balance, stoop, crawl, squat, kneel, and climb stairs and ramps. (Tr. 33-34). Dr. Ezike further found that due to issues with fibrocystic disease, plaintiff should be restricted to exposure to moderate concentrations of dust and other airborne irritants, and because of her arthritis plaintiff should avoid extreme temperatures. (Tr. 34).

## B. Mental Impairments

In May 2006, consultative psychologist Jeanne Spadafora, Ph.D., evaluated plaintiff. (Tr. 308-14). Plaintiff's flow of conversation and thought varied from consistency to confusing statements. Her speech was sluggish. She was unclear and vague about her psychological problems. Plaintiff's affect was flat and her mood was despondent. She reported she had disturbed sleep. At the time of the evaluation, plaintiff had limited mobility, and she required a walker and home health care assistance. Testing of her cognitive functioning showed significant impairment in memory for numbers, in math calculations, in word problems, in conceptualization

---

[3]The purpose of a medical expert is to advise the ALJ on medical issues and answer specific questions about the claimant's impairments, the medical evidence, the application of the listings, and functional limitations based on the claimant's testimony and the record. *See* 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart. When administrative law judges consider these opinions, they will evaluate them using the rules in paragraphs (a) through (e) of this section.").

and in abstraction. Dr. Spadafora surmised: "She must have had head trauma. Since the accident occurred about two months ago, it may be too soon to determine whether there is mental deterioration." (Tr. 313). Dr. Spadafora diagnosed plaintiff with bipolar disorder, panic disorder with agoraphobia, and posttraumatic stress disorder (PTSD) and assessed a Global Assessment of Functioning (GAF) score of 45[4]. (Tr. 314). Dr. Spadafora concluded that plaintiff was markedly impaired in her ability to understand and follow instructions, relate to others, and maintain concentration, persistence, or pace, and she was extremely impaired in her ability to withstand stress and pressures associated with day-to-day activities. (Tr. 313-14).

In July 2006, state agency psychologist Karla Voyten, Ph.D., reviewed the record and completed a mental residual functional capacity (RFC) assessment. Dr. Voyten opined that plaintiff had moderate restrictions in activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 332). Dr. Voyten stated that plaintiff was able to work during the time she reported having mental health problems. (Tr. 338). She also stated that the office notes of Hanna Winchester, M.D., plaintiff's treating source as of January 2006, showed that plaintiff continued to be noncompliant with her medication, she had not shown for several appointments, and she had failed to follow up with a psychiatrist for medication management despite repeated referrals. (*Id.*). Dr. Voyten also noted improvement in

---

[4]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. A GAF score of 41 to 50 refers to an individual with "serious symptoms or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). . . ." *See* DSM-IV at 32.

8

plaintiff's mental health as her physical condition improved, stating that home health care notes revealed that plaintiff consistently reported improvement in pain management and showed less impulsivity and nervousness by the end of treatment in March 2006. (*Id*.). Dr. Voyten opined that plaintiff gave "an exaggerated presentation" to Dr. Spadafora. (Tr. 339). She stated that plaintiff had reported that she had responded well to Paxil in the past, but plaintiff was not compliant with her medication and had not followed her physician's recommendation to see a psychiatrist. (*Id*.). Dr. Voyten concluded that plaintiff's mental condition was severe but that it was not expected to last 12 months. (Tr. 338-39).

Plaintiff was incarcerated from December 2006 through March 2007 for altering a a prescription. (Tr. 341-85, 392-467). Plaintiff underwent an initial medical and mental health screening at the Ohio Reformatory for Women. It was noted she was adequately groomed; had euthymic mood and appropriate affect; had clear, logical and coherent speech; had normal thought process and content without hallucinations or paranoia; and had adequate judgment and insight. (Tr. 350, 352-353). She was diagnosed with bipolar disorder and generalized anxiety disorder, but was considered stable and assigned a GAF of 70[5]. (Tr. 353). Recommendations included attending a bipolar support group and an anxiety support group and undergoing medication management. (Tr. 363). On March 1, 2007, one week prior to her planned release, plaintiff no longer had a depressed mood and had stopped taking her medications. (Tr. 362).

Consultative examining psychologist George Lester, Psy.D., evaluated plaintiff in February 2008. (Tr. 468-75). Plaintiff reported to Dr. Lester that her past psychiatric

---

[5]The DSM-IV categorizes individuals with scores of 61 to 70, as having "some mild" symptoms who but to be "generally functioning pretty well." See DSM-IV at 32.

medications had helped but she was no longer taking them because she could not afford them. (Tr. 469). Plaintiff admitted to past Xanax abuse. Dr. Lester noted that plaintiff demonstrated appropriate affect, though she appeared mildly anxious on occasion; her speech was relevant, thoughtful and coherent; and her mood was depressed. *Id.* She reported that she did some of the household chores such as vacuuming, laundry, and dishes, although her daughter helped with some of these chores, and she did not see friends anymore because she moved away and lost touch with them. (Tr. 472). She visited her mother in a nursing home every three weeks. *Id.* During testing, plaintiff was able to concentrate and attend to tasks and to carry out multi-step instructions. *Id.* Dr. Lester diagnosed mood disorder with features of PTSD, and cannabis and ancialytic (Xanax) abuse in remission. (Tr. 473). He assigned a GAF score of 50. (Tr. 474). Dr. Lester concluded plaintiff had moderate limitations in the ability to relate to others, including fellow workers and supervisors; in the ability to understand, remember, and follow instructions; in the ability to maintain attention, concentration, persistence and pace to perform routine tasks; and in the ability to withstand the stress and pressures associated with day to day work activity. *Id.*

In March 2008, state agency psychologist Patricia Semmelman, Ph.D., reviewed the medical evidence of record and completed a Psychiatric Review Technique and a mental residual functional capacity assessment. Dr. Semmelman opined that plaintiff did not meet or medically equal the Listings. (Tr. 478). She concluded that plaintiff had mild limitations in activities of daily living; moderate limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 488). Dr. Semmelman noted that plaintiff complained about flashbacks

and intrusive thoughts to some doctors, but she did not complain or demonstrate these symptoms in prison. (Tr. 494). Dr. Semmelman stated that prison records did not show plaintiff had any problems interacting with other people or issues adjusting to the prison setting, nor did they show she had ever been sexually assaulted as she had claimed.[6] *Id.* In addition, prison records revealed only mild depression and anxiety. *Id.* Dr. Semmelman concluded that plaintiff's social skills are no worse than moderately impaired; she can interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and nonpublic work setting; and she can cope with ordinary and routine changes in a work setting that is not fast-paced or highly demanding. Dr. Semmelman found plaintiff was inconsistent about information she provided across sources. (*Id.*). In July 2008, R. Kevin Goeke, Ph.D., affirmed Dr. Semmelman's assessment. (Tr. 501).

Dr. Kejriwal saw plaintiff for a checkup and a follow-up in November 2009. (Tr. 620-24). He noted complaints of anxiety and depression and prescribed medication for these conditions. (Tr. 620-21). On January 4, 2010, Dr. Kejriwal completed a form evaluating plaintiff's work-related mental health abilities. (Tr. 607-10). Dr. Kejriwal found that plaintiff had "fair" ability to follow work rules and use judgment and "poor" ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, and persist at a work-like task.[7] (Tr. 608). Dr. Kejriwal listed the limitations and medical clinical findings supporting these assessments as

---

[6]This is not accurate as the prison record reflects that plaintiff was the victim of sexual abuse by her husband as an adult and was counseled for this. (Tr. 355, 358).

[7]The form Dr. Kejriwal completed defined the terms "fair" as "Ability to function in this area is limited but satisfactory" and "poor" as "Ability to function in this area is seriously limited but not precluded." (Tr. 608).

11

"[patient] seems to have [] Social Anxiety Disorder with only slight relief with [medication]" and depression. (*Id*.). In addition, Dr. Kejriwal found that plaintiff had poor ability to understand, remember and carry out complex job instructions; poor ability to understand, remember and carry out detailed, but not complex, job instructions; and fair ability to understand, remember and carry out simple job instructions. (Tr. 609). In support of these findings, Dr. Kejriwal reported: "[Patient] unable to give individual attention due to Nerves and Depression. Poor intellectual ability." (*Id*). Dr. Kejriwal further found that plaintiff had good ability to maintain personal appearance; poor ability to behave in an emotionally stable manner; poor ability to relate predictably in social situations; and fair ability to demonstrate reliability. (*Id*.). Dr. Kejriwal listed no findings in support of these limitations. Finally, Dr. Kejriwal completed a Psychiatric Review Technique form wherein he concluded that plaintiff had slight restriction of activities of daily living; she had moderate difficulties in maintaining social functioning; she often had deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner; and she had repeated (three or more) episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from that situation or to experience exacerbation of signs and symptoms. (Tr. 618).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the

12

work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a) (4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

> 2. The claimant has not engaged in substantial gainful activity since August 25, 2005, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

> 3. The claimant has the following severe impairments: degenerative joint disease, degenerative disc disease, anxiety disorder, and substance abuse disorder. (20 C.F.R. 404.1520(c) and 416.920(c)).

> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

> 5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform work activity, except as follows: She can occasionally lift 20 pounds and frequently lift 10 pounds. She can push/pull 10 pounds with hand or foot controls. She can stand/walk 2 hours a day, and she can sit 6 hours a day. She should not use ropes, ladders, or scaffolds. She can use ramps and stairs no more than occasionally. She can occasionally balance, stoop, crawl, or kneel. She should not be exposed to more than moderate concentration of dust and airborne irritants, and because of arthritis, no extreme heat or cold. She can understand, remember, and carry out only simple instructions. She should have no more than occasional contact with co-workers, supervisors, or the public. The work should be routine and repetitive. There should be no intense focused attention until next break, and no assembly work-pace. There should be no more than ordinary and routine changes in work setting and duties.

> 6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

> 7. The claimant was born [in] 1956 and was 49 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

> 8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2005 through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 13-19).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D. Opinion

On appeal, plaintiff argues that: (1) the ALJ erred by failing to find plaintiff meets Listing 12.04 for affective disorders and Listing 12.06 for anxiety-related disorders; and (2) the ALJ erred in weighing the opinions of the treating and examining physicians and the opinion of the medical expert.

### I. The ALJ did not err by failing to find plaintiff's mental impairments meet Listing 12.04 or 12.06.

The ALJ determined that plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of the Listings. (Tr. 14). The ALJ evaluated plaintiff's mental impairments under Listing 12.06 (anxiety-related disorders) and 12.09 (substance addiction disorders). The ALJ determined that these Listings were not met because plaintiff has only moderate restriction in activities of daily living; she has moderate difficulties in social functioning as evidenced by the fact she reported to Dr. Lester in February 2008 she does not like being around crowds, but she is able to visit her mother in a nursing home every three weeks; she has moderate difficulties with regard to maintaining concentration, persistence or pace; and she has experienced no episodes of decompensation which have been of an extended duration. (*Id.*). The ALJ determined that paragraph C of Listing 12.06 is likewise

not met as of December 2008 because plaintiff was able to leave her home to visit her mother at a nursing home.[8] (*Id.*).

There appears to be no dispute that plaintiff meets the requirements of Part A of Listings 12.04 and 12.06. There is evidence that shows plaintiff suffers from depression and anxiety, and the Commissioner does not dispute that Part A is satisfied for Listings 12.04 and 12.06.

The parties dispute whether paragraph B of the Listings is satisfied.[9] Plaintiff contends her mental impairments meet the requirements of paragraph B based on the assessments of the examining doctors and her treating physician, Dr. Kejriwal. (Doc. 9 at 3-6). Plaintiff argues that the ALJ erred in weighing the findings of her treating and examining sources.

First, plaintiff contends that the ALJ erred by discounting the opinion of the consultative examining psychologist, Dr. Spadafora, finding extreme and marked restrictions in plaintiff's mental functioning. (Doc. 9 at 4, citing Tr. 308-314). Plaintiff asserts that the ALJ's determination that her mental health improved following Dr. Spadafora's 2006 examination is not supported by the evidence of record. Plaintiff notes that nearly two years after Dr. Spadafora issued her assessment, consultative examining psychologist Dr. Lester concluded that plaintiff had "more than a minimal limitation to do basic work activities with a GAF of 50." (*Id.* at 5,

_____

[8]Part C of Listing 12.06 requires that an individual's anxiety-related disorder result in a complete inability to function independently outside the area of one's home. An individual can meet Listing 12.06 if she satisfies Part A of the Listing and either paragraph B *or* paragraph C.

[9]The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id.* The "B criteria" of Listings 12.04 and 12.06 require "marked" limitations of functioning or "repeated" episodes of decompensation, each of extended duration.

citing Tr. 473-74). Plaintiff contends that the findings of Drs. Spadafora and Lester are consistent with the January 4, 2010 assessment completed by her treating physician, Dr. Kejriwal, who found plaintiff to be seriously impaired in a number of work-related areas. (*Id.*, citing Tr. 607-619).

Second, plaintiff contends that the ALJ erred by affording "great weight" to the assessment of the state agency reviewing psychologist, Dr. Semmelman (Doc. 15 at 13-14, citing Tr. 478-95), and less weight to the assessments of plaintiff's treating and examining sources. (*Id.* at 13, citing former 20 C.F.R. § 404.1527(a)(1)). Plaintiff contends that the ALJ failed to specify the evidence he relied on to conclude that Dr. Semmelman's assessment is supported by objective medical evidence of record and plaintiff's activities of daily living. Plaintiff also asserts that Dr. Semmelman did not carefully review the records as shown by her erroneous statement in her report that the prison records did not reflect sexual abuse. (*Id.* at 14, citing Tr. 494, 358).[10]

Plaintiff further contends that the ALJ erred by discounting Dr. Kejriwal's opinion based on a lack of record evidence to support Dr. Kejriwal's finding that plaintiff suffers repeated episodes of decompensation. (*Id.*). Plaintiff argues there is evidence of such episodes, noting:

> [Plaintiff] testified at the hearing that she spends most of [her] time at home and has trouble relating to other people. (Tr. 44). She told Social Security that she fights and yells with others all the time (Tr. 187). And her daughter related to Social Security that [plaintiff] gets very offensive with authority figures i.e. bosses and acts like everyone is against her (Tr. 200)."

(*Id.*).

---

[10]Although Dr. Semmelman stated in her report that the prison records showed no indication of plaintiff ever having been sexually assaulted even though she reported to Dr. Lester that her ex-husband had raped and beaten her (Tr. 494), the prison records do in fact reflect that plaintiff reportedly had been the victim of sexual abuse. (Tr. 355, 358).

The Commissioner does not dispute that plaintiff has some limitations due to depression and anxiety. The Commissioner contends, however, that the ALJ properly discounted the assessment of Dr. Spadafora finding marked and extreme limitations because she formed her opinions two months after plaintiff's motor vehicle accident and plaintiff's mental condition improved considerably as her physical condition improved. (Doc. 12 at 16-17). The Commissioner further contends that the ALJ properly discounted Dr. Kejriwal's opinion as internally inconsistent and at odds with the record as a whole. (*Id.* at 18-19).

The ALJ did not err in weighing the medical evidence pertaining to plaintiff's mental impairments, and his determination that those impairments do not satisfy the Listings is supported by substantial evidence. Only one mental health expert, state agency reviewing psychologist Dr. Semmelman, rendered an opinion as to plaintiff's degree of limitation in each of the paragraph B criteria. Dr. Semmelman opined after reviewing the record in March 2008 that plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 488). Dr. Semmelman explained the bases for her findings in her report and gave great weight to the assessment of the consultative examining psychologist, Dr. Lester. (Tr. 494). The ALJ in turn explained that he was giving great weight to Dr. Semmelman's opinion as supported by the objective medical evidence of record and plaintiff's activities of daily living. (Tr. 17). Insofar as the ALJ relied on Dr. Semmelman's report to determine that plaintiff did not meet the Listings for a mental impairment, the medical evidence of record outlined by Dr. Semmelman in her opinion and by

the ALJ in his decision (Tr. 16-17) substantially supports the ALJ's decision for the reasons explained below.

First, although there are multiple mental health assessments in the record, Dr. Spadafora was the only medical source who opined that plaintiff had marked limitations in two or more of the paragraph B categories of Listings 12.04 and 12.06.[11] (Tr. 313-14). Dr. Spadafora reported that plaintiff was extremely impaired in her ability to withstand pressures associated with daily activities; she was markedly impaired in her ability to relate to others; and she had marked difficulties in maintaining concentration and persistence. (*Id.*). However, the ALJ reasonably decided to reject Dr. Spadafora's assessment, which had been issued very soon after plaintiff's February 2006 motor vehicle accident. The ALJ acknowledged that plaintiff's mental problems following her accident were well-documented by both Dr. Spadafora and Dr. Voyten. (Tr. 16, citing Tr. 308-15, 322-40). However, the ALJ cited substantial evidence showing that plaintiff's mental condition improved with time following the accident. (Tr. 16). Specifically, the ALJ stated that when plaintiff was subsequently incarcerated in December 2006, it was noted during the mental health evaluation performed by the Ohio Department of Rehabilitations and Corrections that plaintiff's appearance and behavior were normal; her mood and affect were euthymic and appropriate; her thought process, thought content, speech, language and perception were normal; and her insight and judgment were normal. (*Id.*). A GAF score of 70 was assigned, indicating only mild symptomatology. (*Id.*). Moreover, the ALJ noted that in February 2008, Dr. Lester reported that plaintiff was cooperative, engaged and pleasant; her flow of

---

[11]Dr. Spadafora gave an opinion as to three of the four areas listed in paragraph B but did not give an opinion as to whether plaintiff had periods of decompensation. By contrast, Dr. Semmelman was the only medical source who gave an opinion as to plaintiff's degree of limitation in each of the four paragraph B categories. (Tr. 488).

20

conversation and thought were normal; her range of affect appeared appropriate, although she appeared to be mildly anxious on occasion; her insight and judgment were normal; sensory and cognitive functioning were considered to be within the normal range; and Dr. Lester thought her intellectual functioning was in the borderline range, even though her full-scale IQ score of 70 fell in the borderline mentally retarded range. (Tr. 17, citing Tr. 468-475). The ALJ reasonably relied on these findings by the Ohio Department of Rehabilitation and Corrections and Dr. Lester to find plaintiff's mental health improved following her motor vehicle accident.

Plaintiff contends that the ALJ nonetheless erred in relying on Dr. Lester's report to discount Dr. Spadafora's assessment because Dr. Lester concluded plaintiff had more than minimal limitations on her ability to perform basic work activities and he assigned her a GAF score of 50, indicating she suffered from serious symptoms. (Doc. 15 at 12, citing Tr. 473-74). Plaintiff asserts that these findings establish that her symptoms meet the Listing 12.04 criteria. (*Id.*). However, it is not enough that a claimant have "more than a minimal limitation" under paragraph B in order to satisfy Listing 12.04 or 12.06: the claimant must have "marked difficulties." Dr. Lester did not opine that plaintiff had "marked difficulties" in any of the specific categories of paragraph B or repeated episodes of decompensation of an extended duration. Rather, Dr. Lester gave no opinion as to episodes of decompensation, and he found that plaintiff had only moderate limitations on her mental functioning. (Tr. 474). Moreover, although the GAF score of 50 assigned by Dr. Lester indicates a "serious" impairment in social and occupational functioning, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"

21

*DeBoard v. Commissioner of Social Security*, 211 F. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 133 F. App'x 684, 691-92 n. 5 (11th Cir. 2005)) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). *See also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning. . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.") (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). *See also Smith v. Commissioner of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (even assuming GAF scores are determinative, GAF scores in high 40s to mid 50s would not preclude the plaintiff from having the mental capacity to hold at least some jobs in the national economy). Thus, the ALJ reasonably determined that Dr. Lester's report does not establish that plaintiff's mental impairment satisfies either Listing 12.04 or 12.06, and the ALJ reasonably relied on the evaluation by the Department of Rehabilitations and Corrections and Dr. Lester's assessment to discount Dr. Spadafora's opinion.

Finally, the ALJ did not err by declining to give controlling weight to the assessment of Dr. Kejriwal, plaintiff treating physician.[12]  It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating

---

[12]Although Dr. Kejriwal apparently treated plaintiff on only two occasions before he issued his assessment, the ALJ considered him to be a treating source. (Tr. 17).

physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Kinsella v. Schweiker,* 708 F.2d 1058, 1060 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Blakley,* 581 F.3d at 406; *Wilson,* 378 F.3d at 544. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011) (citing former 20 C.F.R. § 404.1527(d)(2)).[13] If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Wilson,* 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the

---

[13]Title 20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at §§ 404.1527(d) and 416.927(d).

frequency of examination. 20 C.F.R. §§ 404.1527(c)(2)(i)(ii); 416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6); 416.927(c)(3)-(6); *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. §404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p). However, a violation of the good reasons rule can be deemed to be harmless error "(1) [if] a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation." *Id.* at 940 (citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Wilson*, 378 F.3d at 547).

In giving "less weight" to Dr. Kejriwal's assessment, the ALJ determined that Dr. Kejriwal's opinion was not consistent with the medical evidence of record - including a complete absence of evidence showing periods of decompensation - and it was inconsistent with plaintiff's activities of daily living, including those reflected in a December 2009 Pain Center record (noting that plaintiff performed personal grooming activities independently). (Tr. 17, citing Tr. 607-623,

24

633). The medical record of evidence substantially supports the ALJ's decision to discount Dr.

Kejriwal's assessment for these reasons. Dr. Kejriwal saw plaintiff twice in November 2009 -

once for a checkup and once for a follow-up (Tr. 620-24) - before completing his assessment. (Tr.

607-19). Dr. Kejriwal noted plaintiff's complaints of anxiety and depression and he diagnosed

her with these conditions (Tr. 621). However, he reported no mania, no stressors, no sleep

disturbances, no suicidal ideation, and no paranoia. (*Id.*). On the second visit, Dr. Kejriwal noted

that plaintiff was alert and oriented. (Tr. 623). Yet, despite the paucity of objective mental health

findings in his office notes, when he completed the assessments in January 2010 Dr. Kejriwal

found plaintiff to be "seriously limited" in a number of occupational and personal areas and

opined she suffers from repeated episodes of decompensation.[14] Dr. Kejriwal based his findings

on tentative diagnoses and failed to point to objective medical findings to support the serious

limitations he found.[15] Moreover, the serious limitations Dr. Kejriwal imposed in most categories

listed in the Medical Source Statement are inconsistent with findings he made in the Psychiatric

Review Technique form, wherein he indicated that plaintiff had only slight restriction in her

---

[14]"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode. The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *See* 20 CFR Pt. 404, Subpt. P, App. 1.

[15]Dr. Kejriwal opined that plaintiff "seems to have 1) Social Anxiety Disorder with only slight relief with [medication] and 2) Depression." (Tr. 608). He further opined: "[Patient] unable to give individual attention due to Nerves and Depression. Poor intellectual ability." (*Id*). Dr. Kerjiwal listed no other clinical findings and objective bases for the limitations he imposed.

activities of daily living and moderate difficulties in maintaining social functioning. (Tr. 608-10, 618). Thus, the ALJ reasonably decided not to give Dr. Kerjiwal's opinion controlling weight.

In deciding what weight to give to Dr. Kejriwal's opinion, the ALJ failed to balance a number of the regulatory factors set forth in §§404.1527(c)(2)-(6) and 416.927(c)(2)-(6), such as the length, nature and extent of the treatment relationship and the medical specialty of the source. However, the Court finds the ALJ's omission was harmless. Even if credited, Dr. Kejriwal's assessment does not demonstrate that plaintiff's impairment satisfies either Listing 12.04 or Listing 12.06. Dr. Kejriwal did not opine that plaintiff has "marked" difficulties in any of the specific categories listed under paragraph B. To the contrary, Dr. Kejriwal indicated in the Psychiatric Review Technique form he completed that plaintiff had only slight restriction in her activities of daily living and moderate difficulties in maintaining social functioning, and he indicated plaintiff "often" had deficiencies of concentration, persistence or pace, which fell somewhere between "seldom" and "frequently" and thus appeared to be of moderate degree. (Tr. 618).

Accordingly, the ALJ did not err by failing to find plaintiff suffers from an impairment that satisfies Listing 12.04 or 12.06. Substantial evidence supports the ALJ's findings that plaintiff's mental impairments impose only moderate limitations on her ability to function and that she does not have a mental impairment that meets or equals a listed impairment. (Tr. 14). Plaintiff's first assignment of error should be overruled.

## II. The ALJ erred in weighing the medical evidence of plaintiff's physical impairments.

Plaintiff alleges as her second assignment of error that the ALJ erred by failing to properly weigh the medical opinion evidence pertaining to her physical impairments. (Doc. 9 at 6-11).

The ALJ stated that he gave "little weight" to the opinion of treating physician Dr. Martinez because it was not consistent with the objective medical evidence of record, it was not consistent with plaintiff's activities of daily living, it was not based on objective findings, and it was not based on a long-term treatment relationship (Tr. 17, citing Tr. 521-26); he gave "great weight" to the report of the consultative examining physician Dr. Schapera because his report was based upon objective signs and findings and was consistent with plaintiff's activities of daily living (Tr. 17, citing Tr. 502-511); and he gave "great weight" to the testimony of the non-examining medical expert Dr. Ezike that plaintiff "can perform at the light exertional level" because the ALJ found this testimony was supported by the objective medical evidence of record, was consistent with plaintiff's activities of daily living, and was consistent with the analysis advanced by Dr. Schapera. (Tr. 17).

Plaintiff alleges that the ALJ's opinion is not supported by substantial evidence because the ALJ failed to give controlling weight to the opinion of her treating physician, Dr. Martinez, that she is unable to perform any type of work activity. (Doc. 9 at 6-8, citing Tr. 521-526). Plaintiff contends that Dr. Martinez' opinion is consistent with her testimony at the ALJ hearing as to her limitations (Tr. 43-46); with Dr. Martinez' objective findings made on his physical examinations (Tr. 521-26); and with the objective medical tests, including a September 11, 2008 bone scan showing multi-focal arthropathy (Doc. 15 at 16, citing Tr. 603) and a January 2009 lumbar spine MRI and cervical x-ray (*Id.*, citing Tr. 527-30). Plaintiff contends that the ALJ erred by instead giving great weight to the opinion of the medical expert, Dr. Ezike, who never saw or examined plaintiff, and to the opinion of the consultative examining physician, Dr. Schapera, who examined plaintiff one time on September 25, 2008. (*Id.* at 16-18).

The Commissioner contends that the ALJ did not err by crediting the opinions of other medical sources over the opinion of Dr. Martinez, and the ALJ provided good reasons for discounting Dr. Martinez' opinion that plaintiff's impairments were of disabling severity. (Doc. 12 at 16). The Commissioner contends that to the extent Dr. Martinez opined that plaintiff was unable to work in any job category, the ALJ was entitled to reject Dr. Martinez' opinion because it concerned a legal issue that is the sole province of the Commissioner. (Doc. 12 at 13, citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), SSR 96-5, 1996 WL 374183, at *2). The Commissioner further argues that the ALJ correctly determined that Dr. Martinez' opinions as to plaintiff's functional limitations were not supported by the objective medical evidence or plaintiff's activities of daily living, and the opinions were devoid of adequate explanations or support. (*Id.* at 13-15). The Commissioner further contends that the ALJ properly gave "great weight" to the opinion of the medical expert, Dr. Ezike, that plaintiff was capable of a limited range of light work (Tr. 33-35) because Dr. Ezike was in a unique position to view the entire record. (*Id.* at 16).

Substantial evidence does not support the ALJ's decision to discount the opinion of Dr. Martinez and to rely instead on the contrary conclusions of the non-examining medical expert, Dr. Ezike. Dr. Martinez saw plaintiff on a regular basis and treated her four times before issuing his functional assessment (Tr. 555-60), so that the ALJ should have analyzed his opinion in accordance with the treating physician rule.[16] (Tr. 521-26). However, the ALJ did not analyze Dr.

---

[16]The ALJ found that Dr. Martinez had not established a "long-term treatment" relationship with plaintiff at the time he issued his assessment. (Tr. 17). The Commissioner argues there was no long-term relationship because Dr. Martinez had examined plaintiff only three times. (Doc. 12 at 14). This is incorrect as Dr. Martinez had treated plaintiff four times before issuing his February 19, 2009 assessment. (Tr. 521-526, 555-60). The Commissioner also cites authority for the proposition that the Sixth Circuit has "[g]enerally . . . declined to find that an ongoing treatment relationship exists after just two or three examinations." (Doc. 12 at 14). *See Cooper v. Astrue*, No. 2:10-

Martinez' opinion in accordance with the treating physician rule. *See Cole*, 661 F.3d at 937

(citing former 20 C.F.R. § 404.1527(d)(2)). Although the ALJ stated that Dr. Martinez' opinion

was neither consistent with the objective medical evidence of record and plaintiff's daily

activities, nor based on objective findings (Tr. 17), the ALJ conducted no analysis of these factors

and cited no record evidence to support his conclusions. The basis for the ALJ's conclusions is

unclear as an examination of the record discloses that Dr. Martinez provided a number of

objective bases for his report, including severe cervical facet arthritis lumbar radiculitis, lumbar

facet arthropathy, status right femur fracture, and chondromalacia patella of the right knee. (Tr.

522). In addition, Dr. Martinez stated that the MRI of the lumbar spine from January 2009

showed disc "bulge" at the L2/L3 and L5/S1 levels, as well as degenerative disc disease at L3/L4.

(Tr. 521). The ALJ, however, never acknowledged this evidence or the impact thereof in

assessing either plaintiff's RFC or the weight to afford plaintiff's treating physician.

Similarly, the ALJ did not explain how Dr. Martinez' report was inconsistent with

plaintiff's activities of daily living. The ALJ found that plaintiff vacuums and does laundry and

dishes, although her daughter helps with some of these chores; she watches television; she listens

---

cv-00168, 2011 WL 1118514, at *10 (S.D. Ohio Jan. 25, 2011) (Report and Recommendation, Deavers, M.J.).
(doctor who examined plaintiff once in December 2006, administered epidural injections in January 2007, and
offered an opinion in July 2007 did not have an ongoing treatment relationship with claimant) (citing *Boucher v.
Apfel*, 238 F.3d 419 (Table), 2000 WL 1769520, at *9 (6th Cir. Nov. 15, 2000) (doctor who examined the claimant
three times over a two-year period at the request of state and county agencies was not a "treating source"); *Yamin v.
Commissioner of Social Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) (doctor who examined claimant on only two
occasions did not have a long term overview of claimant's condition); *Helm v. Commissioner of Social Sec. Admin.*,
405 F. App'x 997, 1011 n.3 (6th Cir. 2001) (court questioned whether physician who examines patient three times
over a four-month period is a treating source, but expressed no opinion on the question)). These cases are
distinguishable from the present case on their facts since Dr. Martinez treated plaintiff more than three times. In any
event, the ALJ in the present case made no finding that Dr. Martinez was not a treating doctor.

to music; and she visits her mother at a nursing home once every three weeks. (Tr. 16-17). These limited activities do not, however, demonstrate an ability to perform sustained work activities on a regular basis. Moreover, plaintiff's testimony shows she is much more limited than the ALJ described. Plaintiff testified that she lies down 45 minutes to an hour four to six times during the day, props her right leg up, ices her hip, and sometimes ices her right knee, which may or may not relieve her pain. (Tr. 43). She is unable to stand for a long period of time. (*Id*.). She sleeps three to four hours a night because of right hip pain. (Tr. 44). She cannot cook for herself but microwaves her meals. (Tr. 44). She cannot go shopping because a lot of lifting and standing bothers her, and she does not like to be around crowds, so her daughter does her shopping for her. (*Id*.). She does not drive because her right leg gets too weak and tired. (Tr. 45). She can go halfway up the stairs before she has to stop and rest because her right leg gets weak and tired and starts to hurt. (*Id*.). She goes down the steps sitting down. (Tr. 45). Walking bothers her knee, leg, and hip, and she only walks in her house. (*Id*.). She cannot lift a full gallon of milk because it bothers her right side. (Tr. 46). She cannot sit long enough to watch an entire movie. (*Id*.). The ALJ's decision does not reflect that he took this testimony provided by plaintiff into account in assessing whether Dr. Martinez' opinion was consistent with her activities of daily living.

In addition, the ALJ failed to explain how Dr. Martinez' opinion was inconsistent with the objective medical evidence of record and did not acknowledge objective findings and opinions that are consistent with and support Dr. Martinez' functional assessment. First, Dr. Schapera, who examined plaintiff in September 2008, reported that plaintiff ambulated with a limping gait and opined that plaintiff "appears capable of performing at least a mild amount of sitting, ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects" and that she is

unable to kneel. (Tr. 508-09). Yet, although the ALJ gave "great weight" to Dr. Schapera's opinion, the ALJ never acknowledged or discussed Dr. Schapera's findings that plaintiff had some functional limitations as a result of her knee impairment. (Tr. 17).

In addition, the ALJ failed to elicit testimony to explain the differences in the opinions of Dr. Martinez and Dr. Ezike. Medical expert testimony consistent with the evidence of record can constitute substantial evidence to support the Commissioner's decision. *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "A non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that his opinions differ from those of the examining physicians." *Lyons v. Social Security Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001) (citing *Barker*, 40 F.3d at 794-95) (ALJ was entitled to accept non-examining medical advisor's opinion as to the severity of the plaintiff's impairments where, to the extent the medical advisor's conclusions differed from those of the examining psychologist, the medical advisor explained his position by reference to the objective medical and psychological reports in the plaintiff's file, as well as the undisputed facts concerning the plaintiff's prior work and social history). In the instant case, however, the ALJ erred by crediting the opinion of Dr.

Ezike over that of Dr. Martinez because Dr. Ezike failed to explain why his opinions differed from those of plaintiff's treating physician, Dr. Martinez, in material respects.[17]

The record shows that Dr. Ezike confirmed the objective findings on which Dr. Martinez relied, and Dr. Ezike agreed that those objective findings could produce the symptoms and functional limitations plaintiff reported. (Tr. 30-33). Dr. Ezike explained that following surgery for her broken femur, plaintiff continued to have pain and subsequently developed arthritis at the joints. (Tr. 32). Dr. Ezike opined that plaintiff's impairments would significantly impact her functional capacity and that degenerative joint disease in the lumbar region, knees, and hip "would impact mostly her ability to walk, stand and sit for prolonged period[s] of time." (Tr. 31-32). Yet, Dr. Ezike offered an assessment of plaintiff's functional limitations that differed materially from that provided by Dr. Martinez, who had the benefit of examining plaintiff four times before he rendered his assessment. (Tr. 33-35). Dr. Ezike offered no explanation as to why he disagreed with Dr. Martinez' conclusions. Nor did he cite any evidence in the record that he believed to be inconsistent with the functional limitations found by Dr. Martinez. Thus, the record is not clear as to why Dr. Ezike disagreed with Dr. Martinez and in what respects Dr. Ezike found the objective evidence to be inconsistent with Dr. Martinez' findings. Absent testimony explaining why Dr. Ezike's opinion differed from the opinion of Dr. Martinez, the ALJ was not

---

[17]Plaintiff contends, without citation to the record, that Dr. Ezike testified at the hearing that she can perform light work. (Doc. 15 at 15). In fact, Dr. Ezike testified that plaintiff can stand/walk two hours a day with breaks (Tr. 33), whereas light work requires standing up to six hours a day. SSR 83-10, 1983 WL 31251. The ALJ erroneously found that Dr. Ezike gave testimony that plaintiff "can perform [work] at the light exertional level." (Tr. 17). However, the ALJ's error was harmless as the ALJ found that plaintiff's ability to perform "all or substantially all" of the requirements of light work was impeded by her limitations and that she could perform only the sedentary jobs described by the VE (sorter jobs consisting of 400 in the region and 50,000 nationally and inspector jobs consisting of 500 in the region and 50,000 nationally). (Tr. 18, 55-56).

entitled to accept the medical expert's testimony over that of the treating physician. *Lyons*, 19 F. App'x at 302.

Thus, the ALJ's decision reflects a failure to analyze the factors that must be considered in determining whether a treating physician's opinion is entitled to controlling weight. Nor did the ALJ analyze the factors that must be considered in determining the weight to afford the treating physician's opinion if the ALJ declines to give the opinion controlling weight. The ALJ listed reasons for discounting Dr. Martinez' opinion but did not cite any evidence of record that was inconsistent with Dr. Martinez' objective findings; he failed to point to any activities of daily living that were inconsistent with Dr. Martinez' findings; and he failed to acknowledge the numerous objective findings on which Dr. Martinez based his findings. (Tr. 17). The ALJ's summary dismissal of Dr. Martinez' assessment of plaintiff's functional capacity fails to satisfy the requirement that the ALJ provide "good reasons" for not giving weight to a treating physician's opinion. *See Cole*, 661 F.3d at 937. Accordingly, the ALJ's decision to afford "little weight" to Dr. Martinez' assessment lacks substantial support in the record. Plaintiff's second assignment of error should be sustained.

**IV. This matter should be remanded for further proceedings.**

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.* The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Id.*

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. This matter should be remanded to the Commissioner for reconsideration of plaintiff's RFC and the weight to afford the opinions of plaintiff's examining physician, Dr. Martinez, and the medical expert, Dr. Ezike, and to obtain additional medical testimony and vocational evidence as warranted.

**IT IS THEREFORE RECOMMENDED THAT**:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence

Four of 42 U.S.C. § 405(g).

Date: _5/11/2012_

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

PHYLLIS PEDOTO SMITH,　　　　　　　　　Case No. 1:11-cv-351
　　　　Plaintiff　　　　　　　　　　　　　Dlott J.
　　　　　　　　　　　　　　　　　　　　　Litkovitz, M.J.

　　vs

COMMISSIONER OF
SOCIAL SECURITY,
　　　　Defendant

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections. If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs. A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).